IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| iBAHN CORPORATION, et al,[1] | ) | Case No.: 13-12285 (___) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF RYAN JONSON IN SUPPORT OF FIRST DAY MOTIONS

I, Ryan Jonson, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.      I am the Chief Financial Officer for each of the above-captioned debtors

(the "Debtors"). I first joined the Debtors in 2002, starting as the Company's (as defined below)

Controller. In March of 2012 I became the Company's CFO. In such capacity, my current

duties include oversight of all accounting and financial aspects of iBAHN's operations. Prior to

my employment with the Debtors, I held a range of financial and operational leadership positions

in the technology field. I submit this declaration (the "Declaration") in support of the Debtors'

petitions and "first day" motions and applications, described further below (collectively, the

"First Day Motions"). In my capacity with the Debtors, I have general knowledge of the books

and records of the Debtors, and am familiar with the Debtors' financial and operational affairs.

Except as otherwise indicated, all statements in this Declaration are based upon my personal

knowledge; my review of the Debtors' books and records, relevant documents and other

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: iBAHN Corporation (9189), iBAHN General Holdings Corp. (5253) and iBAHN Leasing LLC (2004).

information prepared or collected by the Debtors' employees; or my opinion based on my experience with the Debtors' operations and financial condition.  In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

2.      Based upon my personal knowledge and my review of the Debtors' books, records and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession during the course of their bankruptcy cases.

3.      Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of these chapter 11 cases (the "Cases").[2]

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

## PART I

### A.    Overview of the Debtors and their Operations

4.    The Debtors and their non-debtor affiliates (collectively referred to herein as the "Company" or "iBAHN")[3] are global technology service providers for the hospitality industry providing integrated digital services, including wired and wireless high-speed internet access, digital television, video-on-demand, and digital audio to guest rooms, conference facilities and other common areas at over 2,200 hotel properties in North America, South America, Europe, Africa, Australia and Asia.  The Company is headquartered in Salt Lake City, Utah, and maintains regional offices in Denver, Colorado, London, U.K., Hong Kong, Stirling, Scotland, Cairo, Egypt, and Sydney, Australia, with additional satellite offices throughout the world.

### Business Operations

5.    The Company conducts business in three operational divisions: (1) the Americas (United States, Canada, Mexico and Peru), (2) EMEA (Europe, the Middle East and Africa) and (3) Asia.  The Debtors operate in the Americas division and the non-debtor subsidiaries operate in the EMEA and Asia divisions.  Traditionally, the Americas and Europe have been the most significant revenue generating sectors of the Company's business, but the Company views Asia and the Middle East as growth areas.

6.    Worldwide, the Company derives most of its revenue through key contracts with large international hotel chains by providing WIFI service to guestrooms.  The

---

[3] The organizational structure of the Company is described in detail below.

Debtors' two largest contracts are with Marriott International and Hilton Worldwide.  The
Company also provides wired and wireless high-speed internet access directly to corporations for
various events and conferences.  The Company's end-to-end IP architecture delivers network
monitoring, management and support capabilities to the hotel properties it services.  In addition,
the Company provides Internet Protocol television ("IPTV") to hotels, a system through which
live television, time-shifted television and video on demand are provided to hotel guest rooms.

      7.     Fiscal year revenues for the Company for the past several are as follows:

| <u>2010</u> | <u>2011</u> | <u>2012</u> |
|---|---|---|
| $ 98.3 million | $ 97.3 million | $ 82 million |

### Financing and Significant Indebtedness

      8.     As summarized below, the Debtors currently owe a total of approximately
$16 million in secured indebtedness to JP Morgan Chase (the "Lender").  Prepetition, JPMC
provided Debtor iBAHN Corporation with revolving and term loan facilities.  Debtors Holdings
and Leasing serve as guarantors of the JPMC obligations as do several of the non-debtor
subsidiaries. In addition, the Debtors owe approximately $4.5 million in trade obligations to their
vendors.  The Debtors' balance sheet shows fixed assets at net book value of $4.3 million as of
July 31, 2013.  On a consolidated basis, the Company owes approximately $8 million in trade
payables and has fixed assets at net book value of $13.6 million.

## Corporate Structure and Management

9.      Corporation is privately held (iBAHN's current primary investors are venture capital firms that invested in iBAHN nearly 15 years ago) and is the parent company for Debtor iBAHN General Holdings Corp., ("Holdings") which, in turn, owns Debtor iBAHN Leasing LLC ("Leasing"). Corporation is the ultimate parent of all of the domestic and foreign affiliates of the Company[4]. A chart showing iBAHN's corporate structure is attached hereto as Exhibit A.

10.     iBAHN Corporation was originally incorporated in the State of Utah on March 26, 1998 under the name of Suite Technology Systems, Inc. On June 8, 1999, the Company was re-incorporated in the State of Delaware and the corporate name was changed to STSN, Inc. On March 10, 2005, the corporate name was changed to iBAHN Corporation ("Corporation").

11.     A majority equity interest in Corporation is held by certain venture capital firms. The balance of the equity in Corporation, approximately 27%, is widely held by more than 350 parties.

12.     In addition to me as the CFO, Edward Helvey recently re-joined iBHAN as the Company's CEO. Mr. Helvey formerly served as iBAHN's Vice President of Online Services from 1999-2001. Mr. Helvey has previously operated technology firms and served in senior management positions for over twenty-five years. This experience includes leading distressed companies though to successful recovery.

---

[4] As indicated on Exhibit A, there are minority interests held by unrelated parties in two of the non-debtor subsidiaries.

## Factors Leading up to Bankruptcy Filing

13.     iBAHN has been adversely affected in recent years primarily by escalating

and costly patent litigation (the "Patent Litigation") and a new certification procedures

implemented by key clients ("Customer Certification").  As a result of these two factors, the

Company has suffered declining revenues and liquidity and has explored strategic alternatives.

### Patent Litigation

14.     On November 17, 2009, Nomadix, Inc., a Delaware corporation based in

Newbury Park, California, filed an action for patent infringement in the U.S. District Court for

the Central District of California in Los Angeles, California (the "Nomadix Litigation") naming

Corporation and others unrelated defendants.  The suit alleged that the Corporation infringed six

Nomadix patents. The complaint seeks unspecified compensatory damages and injunctive relief.

In May of 2011, the District Court permitted Holdings to Intervene in the Nomadix Litigation.

The Company believes it does not infringe the patents in question, has filed responsive pleadings

and is vigorously defending the action. Additionally, the Corporation, now joined by Holdings,

has filed a countersuit alleging patent infringement by Nomadix, Inc. related to iBAHN

technology. The Nomadix Litigation is ongoing.

15.     On July 11, 2008, LinkSmart Wireless Technology, LLC, a California

limited liability company based in Pasadena, California, filed several actions for patent

infringement in the U.S. District Court in Marshall, Texas. The suits allege that the Holdings and

numerous other unrelated defendants infringe a patent issued on August 17, 2004, entitled "User

Specific Automatic Data Redirection System."  Holdings believes it does not infringe the patent

in question, has filed responsive pleadings and is vigorously defending the action. In 2009 the U.S. Patent and Trademark Office undertook a re-examination of the patent which is the subject of this suit, and issued a preliminary finding that the patent is invalid. As a result of the preliminary finding, the case was stayed. In 2012 the preliminary finding was removed and the case was reinstated. Holdings resumed defense against the infringement claim again in 2012. Defense efforts continued through 2012 and into 2013.

16.    While iBAHN has vigorously defended the Patent Litigation and believes it would be ultimately successful in the Patent Litigation, the defenses has come at enormous cost to iBAHN, depleting cash and continuing to cause severe financial strain on the Company.

### Customer Certification

17.    In 2009 Marriott International ("Marriott"), iBAHN's largest customer, implemented a new vendor certification program targeted at establishing specific and consistent standards at their hotels. All contracts were required to be made with vendors that had achieved certification by Marriott under this standard. iBAHN opted not to participate in this first round of certification, because of uncertainty regarding the certification requirements and process.

18.    In 2011 iBAHN determined that certification would be required in order to continue to do business with Marriott and began its development efforts to meet the certification standards. Certification was achieved in January 2013. During the interim period, iBAHN was not able to sign new contracts or contract extensions with Marriott. As a result, iBAHN lost one third of its Marriott Contract revenue base between 2011 and 2013. The loss of revenue has made a restructuring of the iBAHN's business essential to ongoing operations.

## Marketing Efforts

19.     With resources significantly depleted due to the Patent Litigation and

revenue down due to the Customer Certification effort the Company began to evaluate strategic

alternatives and examined the possibility of selling the Company or finding new investment into

the Company.  To help facilitate this process, in March of 2012, the Company engaged Arma

Partners LLP ("Arma") an investment banking firm specializing in M&A and corporate finance

advice in the Communications, Media and Technology sector, to position the Company for an

investment or acquisition.  For more than a year, Arma has worked in this capacity.   Arma

initially contacted more than seventy prospective parties in interest and continues in its efforts to

seek an investor or business combination.  While a number of significant prospects have

surfaced, no transaction has been consummated as of this time.

## Chapter 11 Goals

20.     The Company filed this Chapter 11 Case to preserve value for its creditors

and parties in interest and to provide a platform for iBAHN to restructure its business while

seeking additional investment or possible business combination.  In conducting an orderly

chapter 11 process, value will be maximized for the Company's creditors.

## PART II

## First Day Motions and Applications

21.     In order to enable the Debtors to minimize the adverse effects of the

commencement of the chapter 11 Cases on their liquidation and sales efforts, the Debtors have

requested various types of relief in the First Day Motions filed concurrently with this

Declaration. A summary of the relief sought in each First Day Motion is set forth below.

22.    I have reviewed each of these First Day Motions (including the exhibits

and schedules thereto). The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors'

assets for the benefit of their estates and creditors.

23.    I have reviewed each of the First Day Motions filed contemporaneously

herewith (including the exhibits thereto), and I incorporate by reference the factual statements set

forth in the First Day Motions. It is my belief that the relief sought in each of the First Day

Motions is tailored to meet the goals described above and is critical to the Debtors' estates.

24.    It is my further belief that, with respect to those First-Day Motions

requesting the authority to pay discrete prepetition claims or continue selected prepetition

programs (e.g., those First-Day Motions seeking relief related to the Debtors' obligations to their

employees, customers, vendors, banks, and certain taxing authorities), the relief requested is

essential to the Debtors' efforts to preserve and maximize value in these cases and avoid

immediate and irreparable harm to the Debtors and their estates and creditors.

25.    I believe that any diminution in the limited relief requested in the First

Day Motions could have an immediate and irreparable harmful impact upon the going concern

value of the estates to the detriment of all of the Debtors' stakeholder constituencies. The

Debtors believe that payment of those selected prepetition claims identified in the First Day

Motions will forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

## The DIP Financing Motion

26.     As part of the First-Day Motions, the Debtors have filed a motion seeking authority to obtain secured postpetition financing (the "DIP Financing") from the Lender to ensure that the Debtors have sufficient liquidity to pay vendors and meet their other financial obligations as they continue their operations in Chapter 11. Without the proposed postpetition financing and continued use of the cash derived from customer payments, the Debtors will not have any liquidity to operate their business, and therefore will be unable to fund their ordinary course expenditures or pay the expenses necessary to administer the chapter 11 cases. Simply put, without access to financing and continued use of cash collateral, the Debtors will be required to cease operations and liquidate other than as a going concern, causing irreparable harm to the Debtors, their estates and their creditors. Accordingly, I believe the Debtors have an urgent and immediate need for the DIP Financing and use of cash collateral. After considering all of their alternatives, I believe that the financing to be provided by Lender pursuant to the terms of the DIP Financing represents the best financing presently available to the Debtors.

27.     The only source of secured credit available to the Debtors, other than the use of cash collateral, is the DIP Financing. I believe that the Debtors' efforts to obtain credit, except as provided under the DIP Financing, have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered. Prior to the commencement of these chapter 11 cases, the Debtors solicited potential debtor in possession financing from several sources. No one expressed any interest in providing financing on terms better than those

proposed in the DIP Financing given the existing lenders' outstanding obligations and the liens of the Lender. Further, based on the modest size of the proposed financing $1,500,000 made available to the Debtors by the Lender, no alternative financing proposals have been obtained. The terms of the DIP Financing were negotiated by the Debtors and the Lender at arm's length and in good faith. After considering all of the Debtors' alternatives, I conclude that the financing to be provided by the Lender pursuant to the terms of the DIP Financing represents the best financing presently available to the Debtors.

28.     I further believe that the urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the estates, makes it imperative that the Debtors be authorized to access postpetition financing and use cash collateral immediately upon the first day of these cases, pending the Final Hearing, in order to continue their operations and administer their chapter 11 cases.

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September _____ **6**, 2012

By:      Ryan Jonson
Title:   Chief Financial Officer
         iBAHN Corporation, *et al.*