IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| iBAHN CORPORATION, et al.[1] | ) | Case No. 13-12285 (___) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER:
(I) AUTHORIZING THE DEBTORS TO (A) PAY WAGES,
SALARIES, AND OTHER COMPENSATION, (B) MAINTAIN EMPLOYEE
MEDICAL AND SIMILAR BENEFITS, AND (C) PAY REIMBURSABLE
EMPLOYEE EXPENSES; AND (II) AUTHORIZING BANKS AND OTHER
FINANCIAL INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT
REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING**

iBAHN Corporation and its affiliated chapter 11 debtors, debtors and debtors in possession (collectively, the "Debtors"), hereby move the Court (the "Motion") for entry of an order: (a) authorizing, but not requiring the Debtors to (i) pay and/or honor prepetition wages, commissions, salaries, and other compensation, (ii) maintain employee medical and other benefits and (iii) pay reimbursable employee expenses; and (b) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: iBAHN Corporation (9189), iBAHN General Holdings Corp. (5253), and iBAHN Leasing LLC (2004). The location of the Debtors' headquarters and the service address for each of the Debtors is 2755 E. Cottonwood Parkway, Suite 400 Salt Lake City, Utah 84121.

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## Background

3.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4.      The Debtors and their non-debtor affiliates (collectively referred to herein as the "Company") are global technology service providers for the hospitality industry providing integrated digital services, including wired and wireless high-speed internet access, digital television, video-on-demand, and digital audio to guest rooms, conference facilities and other common areas at over 2,200 hotel properties in North America, South America, Europe, Africa, Australia and Asia. The Company also provides wired and wireless high-speed internet access

2

directly to corporations for various events and conferences. The Company's end-to-end IP architecture delivers network monitoring, management and support capabilities to the hotel properties it services. The Company is headquartered in Salt Lake City, Utah, and maintains regional offices in Denver, Colorado, London, U.K., Hong Kong, Stirling, Scotland, Cairo, Egypt, and Sydney, Australia, with additional satellite offices throughout the world.

5.      The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Ryan Jonson in Support of First Day Motions* (the "Jonson Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

6.      The Debtors currently employ 73 full-time employees and one part-time employee in supervisory, management, sales, administrative, and technical support positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"). The Debtors employ both salaried and hourly Employees. 12 Employees are paid hourly and 61 Employees are salaried.

7.      To minimize the personal hardships that the Employees will suffer if their prepetition employment-related obligations are not paid or honored, to maintain the morale of the Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations, the Debtors, by this Motion, seek authority, in their sole discretion, to: (i) pay unpaid prepetition claims for wages, commissions and salaries to the Employees (the "Unpaid Wages"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain certain benefits (as more fully set forth below) offered by the Debtors

3

(the "Benefits"); (iv) reimburse certain unpaid business expenses incurred prepetition by the Employees; and (v) pay all costs incident to the foregoing as set forth in detail below.

## The Debtors' Compensation and Benefits Programs

### A.    The Debtors' Workforce

8.    The Debtors' technical support facilities and corporate headquarters employ approximately 74 Employees.  The majority of the Debtors' Employees, approximately 45 in all, perform critical administrative functions from the Debtors' U.S. headquarters located in Salt Lake City, UT.  An additional nine of the Debtors' Employees provide technical support from the Debtors' facility located in Denver, CO.  The Debtors also employ 20 salespersons and service technicians who are located throughout the United States.  None of the Debtors' Employees are associated with a national union.

### B.    The Debtors' Compensation Procedures

9.    The Debtors' aggregate monthly payroll including wages, salaries and commissions, is approximately $500,000 per month.  Employees, including both salaried and hourly Employees, are paid one week in arrears on a bi-weekly basis, with direct deposits or checks issued on the 6th or 7th day after the close of each pay period.  The Debtors pay their Employees through an outside payroll administrator, Automated Date Processing, Inc. ("ADP").

10.    On August 28, 2013, the Debtors delivered to ADP funds for direct deposits and paychecks distributed on August 30, 2013 (the "Last Pay Date").  The pre-petition payroll funding for the Last Pay Date included payment for salaried Employee and hourly Employee wages earned between August 9, 2013 and August 23, 2013.  Thus, as of the Petition

4

Date, Employees are owed Unpaid Wages earned between August 24, 2013 and the Petition Date.

11.     As of the Petition Date, the Debtors owe an estimated $190,000 for the gross amount of earned but Unpaid Wages. No single Employee is owed more than $12,475 in Unpaid Wages. The Debtors therefore seek authority to pay the Unpaid Wages up to a total and aggregate amount of $210,000.[2]

12.     In the ordinary course of its business, the Debtors routinely withhold from their Employees' wages certain amounts that the Debtors are required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). In addition to the Unpaid Wages, the Debtors estimate that as of the Petition Date, approximately $132,000 of the Debtors' Withholding Obligations to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages. The Debtors also request authority to pay the Withholding Obligations, up to $150,000 in connection with the payment of the Unpaid Wages, plus any amounts subsequently deemed to be due and owing pursuant to any audit of the Withholding Obligations which occurs after the Petition Date.

13.     As noted above, ADP processes the Debtors' payroll. ADP draws funds from the Debtors' account approximately two days in advance of each payday and is responsible

---

[2] As noted above, certain of the Employees are paid by live check. By this Motion, the Debtors seek authority to honor or re-issue postpetition any live check issued to an Employee prior to the Petition Date on account of prepetition wages, but not yet honored.

for remitting all applicable withholdings and payroll taxes with respect to the Employees.  In the

ordinary course of business, the Debtors provide applicable schedules in advance of the payroll

payment period, and ADP issues payroll checks.  The Debtors pay approximately $6,000 per

month to ADP on account of payroll processing services.  The Debtors estimate that they may

owe ADP approximately $10,500 on account of prepetition services.  By this Motion, the

Debtors request authority to continue to use ADP's payroll processing services and to pay any

prepetition amounts that may be due to ADP up to a total and aggregate amount of $20,000 (the

"ADP Payments").

**C.**     **Business Expense Reimbursements**

14.     The Debtors customarily reimburse Employees who incur business

expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such

expenses typically include, but are not limited to, business-related travel expenses, including air

travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and

miscellaneous other allowed travel expenses (the "General Reimbursement Obligations").  Such

General Reimbursement Obligations also include amounts billed by Employees to corporate

charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in

support of the Debtors' businesses.

15.     It is difficult for the Debtors to determine the exact amounts of General

Reimbursement Obligations that are due and owing for any particular time period since the

expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly

basis.  Additionally, there may be some delay (typically up to one month) between when an

Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the average monthly amount of General Reimbursement Obligations for all Employees was approximately $25,000.

16.    By this Motion, the Debtors seek authority to pay any prepetition General Reimbursement Obligations (including any such amounts due to former employees) up to a total amount of $50,000 and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

**D.    The Debtors' Health Benefits Programs**

17.    The Debtors provide several health and related benefit plans to their Employees, including medical insurance, dental insurance, vision insurance, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Health Plans"), as described in more detail below.  Employees are eligible to participate in the Health Plans commencing on the first day of the month following the start of employment.

18.    The insurers of the Health Plans invoice the Debtors in advance for the full amount of premiums owing for the Debtors' Employees as of the first of each month for that month's coverage period.  Accordingly, as of the Petition Date, the Debtors have outstanding monthly invoices for September 2013 to the insurance providers for the Health Plans.  The Debtors seek authority to pay any amounts owed for their Health Plans on account of prepetition obligations owed to the Health Plan insurers and to continue to pay their postpetition Health Plan

7

premiums in their discretion and in the ordinary course of their businesses, as more specifically set forth below.

19.     For most of the Health Plans, Employees make contributions and the Debtors deduct the Employees' portion of the premiums owing under the Health Plans from the Employees' Wages every pay period.  As required by law, the Debtors also offer coverage under certain of the Health Plans to their former employees who have elected COBRA coverage.  In the case of the former employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Employees.  Instead, such former employees pay the full amount of the premiums due to a third party COBRA administrator, National Benefits Service.  Although the Debtors advance the premium amounts for these former employees when the Debtors pay their monthly invoices to the Health Plans, these amounts are reimbursed to the Debtors by National Benefits Service, who collects the premium amounts owing directly from the former employees and remits them to the Debtors.  National Benefits Service retains a portion of the amounts collected from the previous employees as a fee for their services as COBRA administrator.  As part of the relief requested hereunder, the Debtors request authority to pay any prepetition premium payments relating to COBRA coverage (which are fully paid by the former employees), to pay National Benefits Service for their services as COBRA administrator for their Health Plans and to continue to make such payments in the ordinary course of business.

**Medical Plans**

20.     The Debtors provide fully insured medical insurance plans (the "Medical Plans") to their full-time Employees through UnitedHealthcare. ("United").  Employees are

8

provided a choice of two levels of coverage utilizing the UnitedHealthcare Choice Plus network of hospitals, physicians and other health care professionals.

    a.  Employees are eligible to participate in United's traditional preferred provider plan ("PPO Medical Plan").  Under the PPO Medical Plan, Employees have access to in-network savings with doctors, hospitals, pharmacies, and ancillary care providers, but are also provided benefits for covered services from out-of-network providers.  The Debtors contribute a fixed percentage of the monthly premiums due under the PPO Medical Plan according to the following schedule:

| | PPO Employee Contribution (non-smoker) | PPO Employee Contribution (smoker) | Total Monthly Premium |
|---|---|---|---|
| Employee | $86.12 | $111.12 | $430.34 |
| Employee + Spouse | $268.62 | $293.62 | $895.39 |
| Employee + Children | $250.31 | $275.31 | $834.35 |
| Family | $379.39 | $404.39 | $1,264.64 |

The PPO Medical Plan requires Employees to pay only a minimal co-payment for routine services from health care providers.  For more expensive in-network services, after the Employees satisfy a deductible yearly deductible of $1,000 per individual and $3,000 per family, the PPO Medical Plan pays 80% of claims up to a out-of-pocket maximum of $5,000 per individual and $10,000 per family, and 100% of claims the exceed the out-of-pocket maximum. The PPO Medical Plan also pays benefits for covered services from out-of-network providers, but requires Employees to pay a higher yearly deductible, limits payment of claims to 60% of

9

cost and sets a higher yearly out-of-pocket maximum.  Also, the PPO Medical Plan does not

establish co-payments for routine visits to out-of-network providers.

                b.       Employees are also eligible to participate in United's medical plan

designed to take advantage of additional savings provided by health saving accounts managed by

the Employees ("HSA Medical Plan").  Similar to the PPO Medical Plan, Employees choosing

the HSA Medical Plan have access to in-network savings with doctors, hospitals, pharmacies,

and ancillary care providers, but are also provided benefits for covered services from out-of-

network providers.  The Debtors contribute a fixed percentage of the monthly premiums due

under the PPO Medical Plan according to the following schedule:

|  | HSA Employee Contribution (non-smoker) | HSA Employee Contribution (smoker) | Total Monthly Premium |
|---|---|---|---|
| Employee | $68.00 | $93.00 | $339.99 |
| Employee + Spouse | $175.21 | $200.21 | $700.85 |
| Employee + Children | $163.22 | $188.22 | $652.87 |
| Family | $247.76 | $272.76 | $991.05 |

The HSA Medical Plan includes many of the same features as the PPO Medical Plan, but with a

higher yearly deductible and without the convenience of routine services offered through co-

payment.  In return for these slightly higher up-front costs, the yearly out of pocket maximum for

both in-network and out-of-network services are reduced significantly.  Unlike the PPO Medical

Plan, the HSA Medical Plan permits Employees to pay deductibles and other costs from their

individual health savings accounts.

DOCS_DE:189232.5 39476/001

21.     Each pay period, the Debtors deduct from the Employees' wages, the Employees' portion of the Medical Plan contribution, which amount depends upon the plan they select (together, the "Medical Plan Contributions").  On average, the Debtors pay approximately $75,000 on account of their Medical Plans to their insurers each month, which amount includes the Employee contributions deducted from Employee wages later in the same month and $3,000 in COBRA premium payments on behalf of COBRA participants.

22.     As of the Petition Date, the Debtors have not yet paid the September 2013 invoices received from United on account of their Medical Plans.  The Debtors seek authority to pay United the Medical Plan Contributions not to exceed $100,000 for the September invoices and any other Medical Plan Contributions that came due pre-petition for which the Debtors are not yet aware.  The Debtors seek authority to continue to offer their Medical Plans postpetition in the ordinary case of business and in their discretion.

**Dental Plans**

23.     The Debtors offer their eligible Employees dental insurance through MetLife (the "Dental Plan").  Under the Dental Plan, Employees can select any provider of services, but will be assessed a lower yearly deductible for services provided by a dentist in the MetLife network.  The Dental Plan provides for payment of 100% of preventive services, 80% of restorative services and 50% of major/orthodontic services.  The Debtors contribute to the monthly premiums of Employees due under the Dental Plan pursuant to the following schedule:

11

|  | Dental Plan Employer Contribution | Dental Plan Employee Contribution | Total Monthly Premium |
|---|---|---|---|
| Employee | $36.26 | $7.26 | $43.52 |
| Employee + Spouse | $72.26 | $21.69 | $93.95 |
| Family | $123.91 | 43.37 | $167.28 |

24.     Each pay period, the Debtors deduct from the Employees' wages, the Employees' portion of the Dental Plan contribution (the "Dental Plan Contributions").  On average, the Debtors pay approximately $10,000 on account of their Dental Plans per month, which amount includes the Employee contributions deducted from Employee wages later in the same month and $250 in COBRA premium payments.

25.     As of the Petition Date, the Debtors have not yet paid the September 2013 invoices received from MetLife on account of their Dental Plans.  The Debtors seek authority to pay MetLife the Dental Plan Contributions not to exceed $15,000 for the September invoices and for any other Dental Plan Contributions that will come due pre- petition for which the Debtors are not yet aware.  The Debtors seek authority to continue to offer their Dental Plans postpetition in the ordinary case of business and in their discretion.

**Vision Plans**

26.     The Debtors offer their eligible Employees a voluntary vision insurance plan through EyeMed (the "Vision Plan").  By choosing a provider in the EyeMed network of vision care providers, Employees are able to take advantage of significant savings and discounts for examination, eyeglasses and contact lenses.  If Employees choose a care provider outside of the EyeMed network, Employees can submit claims to the EyeMed network for partial

reimbursement of vision care expenses.  To participate in the Vision Plan, Employees must pay

the monthly premiums pursuant to the following schedule (the Debtors do not contribute to the

monthly premiums paid by Employees to participate in this voluntary plans):

|  | Vision Plan Monthly Premium |
|---|---|
| Employee | $4.00 |
| Employee + Spouse | $7.56 |
| Employee + Children | $7.96 |
| Family | $11.72 |

27.  Each pay period, the Debtors deduct the Vision Plan contribution from the

Employees' wages (the "Vision Plan Contributions").  On average, the Debtors pay, on behalf of

their Employees, approximately $500 on account of their Vision Plans per month, which amount

represents the Employee contributions deducted from Employee wages later in the same month.

28.  As of the Petition Date, the Debtors have not yet paid the September 2013

invoices received from EyeMed on account of their Vision Plans.  The Debtors seek authority to

pay EyeMed the Vision Plan Contributions not to exceed $1,000 for the September invoices and

for any other Vision Plan Contributions that will come due pre- petition for which the Debtors

are not yet aware.  The Debtors seek authority to continue to offer their Vision Plans postpetition

in the ordinary case of business and in their discretion.

**Life, AD&D and Disability Insurance**

29.  The Debtors provide their Employees with life insurance, accidental death

and dismemberment insurance, short-term disability insurance, and long-term disability

insurance though their insurance carriers.  The Debtors also offer supplemental life insurance to

13

their Employees and their Employees' dependents.  The Debtors seek authority to continue to offer the Life Insurance, AD&D Insurance and Disability Insurance (each as defined below) postpetition in the ordinary course of business in their discretion.  The Debtors' premium contributions to the Life Insurance, AD&D Insurance and Disability Insurance total, in the aggregate, approximately $3,000 per month.  The Debtors seek authority to pay up to $4,000 for all of these programs for September 2013 invoices and for any pre-petition amounts that may be owed for which they are not yet aware and to continue to pay any Life Insurance, AD&D Insurance and Disability Insurance premium amounts arising postpetition on the ordinary course of business in their discretion..

30.    Life Insurance and AD&D Insurance.  The Debtors provide basic life insurance ("Life Insurance") and accidental death and dismemberment insurance ("AD&D Insurance") to all Employees through CIGNA.  The maximum benefit provided by both the Life Insurance and AD&D Insurance is equal to the individual Employee's basic annual earnings. The Debtors pay 100% of such premiums.

31.    Voluntary Insurance.  The Debtors also offer their Employees with an option to elect (at their cost) additional life insurance and additional accidental death and dismemberment insurance through CIGNA, which policies provide coverage above what the Debtors offer ("Voluntary Programs").  Such amounts are included in the Withholding Obligations discussed above.  The Debtors seek authority to continue to offer the Voluntary Programs postpetition in their ordinary course of business.

32.     <u>Disability Insurance</u>.   The Debtors Employees who work a minimum of 30 hours per week with short- and long-term disability benefits through CIGNA (collectively, the "Disability Insurance").   The Debtors pay for Disability Insurance for all Employees.

## E.     **Workers' Compensation**

33.     Under the laws of the various states where the Debtors conduct their businesses, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors.  The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Policy") with the Diversified Insurance Group with the policy provided through Travelers Insurance ("Travelers") pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability.  The Debtors pay no deductible or self-insured retention under their Workers' Compensation Policy, and are not subject to any retroactive adjustments to their current premiums.  The current term of the Workers' Compensation Policy runs through June 30, 2014, and costs $40,456 on an annual basis.[3]

34.     The Debtors submit that the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition and to pay all premium installments to Diversified Insurance Group as they come due in the ordinary course of business for going forward coverage.

---

[3] The Debtors will make a deposit payment of $10,116 and 5 monthly payments of $6,068 to pay the annual Workers Compensation premium in full.

15

F.    **Time-Off Benefits.**

35.    All Employees receive paid time-off ("PTO") benefits as part of their overall compensation.  On an annual basis, Employees accrue 80-160 hours of PTO according to the following schedule:

| Years of Service | Vacation Allowance | Accrual per Pay Period | Maximum Accrual Cap |
|---|---|---|---|
| Up to 3 | 80 hours | 3.08 hours | 80 hours |
| 3 – 7 | 120 hours | 4.62 hours | 120 hours |
| 7 + | 160 hours | 6.16 hours | 160 hours |

Upon termination, Employees are paid for earned but unused PTO.  The Debtors anticipate that Employees will utilize PTO post-petition, including certain PTO that may have accrued before the Petition Date.  The Debtors seek authority (but not direction) to honor all earned PTO in the ordinary course consistent with the existing guidelines and policies described in this paragraph, regardless of whether it accrued during the pre or postpetition period.

36.    The Debtors also provide their Employees with five paid sick days and eleven paid holiday days per year.

37.    The Debtors request authority in their discretion to honor existing PTO and sick obligations accrued prior to the Petition Date by their Employees and develop any similar policies regarding time away from work and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

G.    **401(k) Savings Plans**

38.    The Debtors maintain a 401(k) plan for the benefit of their Employees (the "401(k) Plan").  The 401(k) Plan provides for automatic pre-tax salary deductions of eligible

16

compensation up to certain limits set by the Internal Revenue Code.  Approximately 40

Employees participate in the 401(k) Plan, and the approximate monthly amount collectively

withheld from Employees' paychecks is $9,000.  The Debtors do not currently pay matching

contributions to the 401(k) Plan.  As of the Petition Date, there are no accrued but unfunded

matching contributions with respect to the 401(k) Plan.  The Debtors utilize Fidelity Investments

as the Plan Trustee and Recordkeeper.  The Debtors pay Fidelity Investments approximately

$1,000 per month for the administrative costs and monthly processing fee for the 401(k) Plan.

The Debtors request authority, in their discretion, to continue their existing 401(k) Plan and pay

any 401(k) fees to Fidelity Investments in the ordinary course of the Debtors' business.

## H.    **Incentive and Bonus Plans**

39.    In the ordinary course of business, the Debtors maintain various incentive

plans to encourage their Employees to maximize the value of the Debtors' enterprise

(collectively, the "Incentive Plans").  These Incentive Plans are an important component of

employee compensation and provide substantial value to the Debtors' estates because they

encourage Employees to achieve important financial performance and quality goals.  Given that

no payments under the Incentive Plans are currently due, the Debtors are not seeking authority to

honor obligations under the Incentive Plans at this time and will seek further relief from the

Court, as appropriate, before making any payment to any Employee on account of the Incentive

Plans.

17

## **Relief Requested**[4]

40.    Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy

Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in

their sole discretion:

a.    the Unpaid Wages, including any associated payroll processing obligations;

b.    any Withholding Obligations attributable to the period prior to the Petition Date and to remit the same to applicable taxing authorities or other appropriate third-parties;

c.    the General Reimbursement Obligations;

d.    all prepetition obligations under the Medical Plans including the Medical Plan Contributions;

e.    all prepetition obligations under the Dental Plan including the Dental Plan Contributions;

f.    all prepetition obligations under the Vision Plan including the Vision Plan Contributions;

g.    all prepetition obligations under the Workers' Compensation Policy, including those obligations incurred prepetition and liquidated post-petition;

h.    honor time off benefits earned prepetition by Employees; and

i.    any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Prepetition Employee Obligations.").

41.    The Debtors also seek authority to continue, in their sole discretion, on a

postpetition basis:

a.    the Health Plans, including the Medical Plans, the Dental Plan and the Vision Plan;

b.    the Disability Insurance, Life Insurance, AD&D Insurance and Voluntary Life Insurance Programs;

c.    the Workers' Compensation Policy;

---

[4] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

18

      d.      PTO policies pursuant to the terms of the Debtors' applicable policies and this Motion;

      e.      their existing 401(k) Plan including payment of any 401(k) fees in the ordinary course of the Debtors' business; and

      f.      any other benefit program described in this Motion for which authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Employee Programs.").

42.     The Debtors represent that (i) they will not distribute any amounts over $12,475 directly to any individual employee on account Unpaid Wages and (ii) they will not pay any amounts in excess of the estimated outstanding amounts for each category of prepetition claim identified herein without further order from this Court.

43.     To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize and direct the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

44.     Notwithstanding the authority requested in this Motion, the Debtors, in the ordinary course of business sometimes modify, change and discontinue employee programs and implement new employee programs and will continue to do so during these Chapter 11 Cases, and will provide notice thereof as required by applicable rules and law.

### Basis for Relief

45.     Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*).  Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice

19

and a hearing.  Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into

transactions in the ordinary course of business without notice and a hearing.  Bankruptcy Code

section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

46.     The relief requested in this Motion is supported by the well-established

"necessity of payment" doctrine.[5]  The "necessity of payment" doctrine, which has been

embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to

reorganization is essential to the continued operation of the [business] during reorganization,

payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry.*

*Co.*, 657 F.2d 570, 581 (3rd Cir. 1981).  *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737

(Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New*

*England Ry. Co.* with approval).  Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R.

174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the

existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition

claims where such payment is essential to the continued operation of the debtor." *Id.* at 176.  In

that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition

wages, salaries, medical benefits, and business expense claims.  Judge Lifland relied on his

equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of

payment" doctrine to authorize such payments, recognizing that the debtor had to make the

---

[5]  The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

payments in order to retain its current employees and maintain positive employee moral--two

factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing*

H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the

"necessity of payment" doctrine applies to the payment of prepetition employee compensation

and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the

"necessity of payment" doctrine, bankruptcy court should defer to the debtor's business

judgment in permitting payment of certain workers' compensation claims).

      47.    This Court similarly has approved the payment of prepetition claims of

employees for wages, salaries, expenses, and benefits on the grounds that the payment of such

claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re*

*Conexant Sys., Inc.*, 13-10367 (MFW) (Bankr. D. Del. Mar. 1, 2013) (stating that relief requested

is in the "best interests" of the debtors); *In re Monitor Co. Grp. Ltd. P'ship*, No. 12-13042 (CSS)

(Bankr. D. Del. Dec. 4, 2012) (same); *In re Coach Am Grp. Holdings Corp.*, No. 12-10010 (KG)

(Bankr. D. Del. Jan. 5, 2012) (same); *In re PTL Holdings LLC*, Case No. 11-12676 (BLS)

(Bankr. D. Del. Aug. 25, 2009) (same); *In re Point Blank Systems, Inc.*, Case No. 10-11255

(PJW) (Banks. D. Del. Apr. 14, 2010) (same).

      48.    The "necessity of payment" doctrine authorizes the Debtors to pay the

amounts it seeks authority to pay pursuant to this Motion because the Debtors' Employees are

critical assets necessary both to the Debtors' operations and the successful prosecution of these

Chapter 11 Cases.

21

49.    Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of

Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance,

and sick leave pay" earned within 180 days before the Petition Date are afforded priority

unsecured status to the extent of $12,475 per Employee.  The Debtors believe that all of the

Unpaid Wages relating to the period prior to the Petition Date constitute priority claims under

sections 507(a)(4) of the Bankruptcy Code.  As priority claims, the Unpaid Wages must be paid

in full before any general unsecured obligations of the Debtors may be satisfied.  Accordingly,

the relief requested may affect only the timing of the payment of these priority obligations, and

will not prejudice the rights of general unsecured creditors or other parties in interest.

50.    Pursuant to the relief requested herein, the Debtors request authority only

to pay up to the $12,475 statutory cap under Bankruptcy Code section 507(a)(4) to each

Employee on account of all Unpaid Wages collectively owing to such Employee.[6]

51.    Many Employees live from paycheck to paycheck and rely exclusively on

receiving their full compensation or reimbursement of their expenses in order to continue to pay

their daily living expenses.  These Employees may be exposed to significant financial and

healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid

Wages and Benefits, and the expenses associated therewith, in the ordinary course of the

Debtors' business.  Moreover, the Debtors believe that if they are unable to honor accrued

---

[6] In the event any unpaid amounts owing to any Employee on account of Unpaid Wages exceed the $12,475 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

22

Unpaid Wages and the Benefits described above, including honoring earned vacation time,

Employee morale and loyalty will be jeopardized at a time when Employee support is critical.

52.     If the Debtors are not authorized to pay for medical benefits, then many of

the Debtors' Employees may not be reimbursed or otherwise have their medical benefits claims

paid.  In addition, certain Employees may become primarily obligated for the payment of these

claims in cases where health care providers have not been reimbursed.   The Debtors believe that

potentially enormous hardship could be visited upon these employees if the Debtors are not

authorized to honor the resultant Medical Plan Contributions.  The Debtors believe the

uncertainty regarding the payment of Medical Plan Contributions will cause significant anxiety

at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency.

Furthermore, the Debtors believe that the Medical Plan Contributions are entitled to priority

status under sections 507(a)(5)(A) and (B) of the Bankruptcy Code.

53.     The Withholding Obligations or other amounts either voluntarily or

involuntarily withheld from Employee paychecks do not constitute property of the Debtors'

estate and principally represent employee earnings that governments (in the case of taxes),

Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the

case of involuntary Withholding Obligations), have designated for deduction from Employee

paychecks.  The failure to transfer these withheld funds could result in hardship to certain

Employees.  The Debtors expect inquiries from garnishers regarding the Debtors' failure to

submit, among other things, child support and alimony payments, which are not the Debtors'

property but, rather, have been withheld from Employee paychecks.  Moreover, if the Debtors

cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

54.     Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations.  Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estate. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

55.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets.  Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

### Satisfaction Of Bankruptcy Rule 6003 And Waiver Of Bankruptcy Rule 6004

56.     Finally, Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the

24

Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Jonson Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

57.    To implement the foregoing successfully and insure the wages and benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

### No Assumption or Assignment of Employee Benefits

58.    To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Moreover, authorization to pay all amounts on account of Unpaid Wages and Benefits shall not affect the Debtors' right to contest the amount or validity of these obligations.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

59.    The Debtors request that all applicable banks and other financial

institutions be authorized to receive, process, honor, and pay all checks presented for payment

and to honor all fund transfer requests made by the Debtors to Employees, whether such checks

were presented or fund transfer requests were submitted prior to, on, or after the Petition Date.

The Debtors represent that they have (or will have) sufficient postpetition funding to pay

promptly all Unpaid Wages and Benefits, to the extent described herein, on an ongoing basis and

in the ordinary course of business.  Nothing contained in this Motion, however, shall constitute a

request for authority to assume any agreements, policies, or procedures relating to Unpaid Wages

and Benefits.  Further, the Debtors seek to retain the discretion to decide which Unpaid Wages

and Benefits it will pay and honor, and nothing in this Motion shall be deemed an admission by

the Debtor that any Unpaid Wages and Benefits will in fact be paid or honored.

60.    Finally, the Debtors request authority to pay all of the processing fees

associated with payment of the Unpaid Wages and Benefits including, but not limited to, any

fees owed to any third party administrators of Benefits as described in the Motion.

**Notice**

61.    Notice of this Motion has been given to (i) the Office of the United States

Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to

their counsel, if known.  As the Motion is seeking "first day" relief, within two business days of

the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered

DOCS_DE:189232.5 39476/001

respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

62.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Court should authorize, but not require, the Debtors to pay all of the above listed in this Motion, including: prepetition wages, salaries, and other compensation, employee medical and similar benefits, and reimbursable employee expenses, and authorize banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and grant such other and further relief as is just and proper.

Dated:    September 6, 2013                    PACHULSKI STANG ZIEHL & JONES LLP


                                                        /s/ Timothy P. Cairns
                                                        Laura Davis Jones (DE Bar No. 2436)
                                                        David M. Bertenthal (CA Bar 167624)
                                                        James E. O'Neill (DE Bar No. 4042)
                                                        Timothy P. Cairns (DE Bar No. 4228)
                                                        919 North Market Street, 17th Floor
                                                        Wilmington, DE 19899
                                                        Telephone:  302-652-4100
                                                        Facsimile:   302-652-4400
                                                        E-mail:ljones@pszjlaw.com
                                                               dbertenthal@pszjlaw.com
                                                               joneill@pszjlaw.com
                                                               tcairns@pszjlaw.com

                                                        [Proposed] Counsel to the Debtors and Debtors in Possession