IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| iBAHN CORPORATION, et al.,[1] | ) Case No.: 13-12285 (PJW) |
| | ) (Jointly Administered) |
| Debtors. | ) |

Objection Deadline: December 9, 2013 at 4:00 p.m. (prevailing Eastern time)
Hearing Date: December 16, 2013 at 10:30 a.m. (prevailing Eastern time)

## DEBTORS' MOTION FOR AN ORDER APPROVING AN INCENTIVE PLAN AND AUTHORIZING PAYMENTS THEREUNDER

By this motion (the "Motion"), iBAHN Corporation, et al., the captioned debtors and debtors in possession (the "Debtors") seek the entry of an order approving a performance-based incentive plan, and authorizing payments thereunder to certain employees. In order to maximize the value of their assets for the benefit of all creditor constituencies, the Debtors are pursuing a proposed sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") and/or a chapter 11 plan (the "Plan"). By this Motion, the Debtors seek court approval of a key employee incentive plan (the "Incentive Plan") in order to incentivize certain of the employees whose work is critical to achieving the Sale and/or Plan. A copy of the Incentive Plan is attached hereto as Exhibit A. The Incentive Plan covers three employees: Edward Helvey (Chief Executive Officer and President of the Debtors), Ryan Jonson (Chief Financial Officer of the Debtors) and Jack Brannelly (General Counsel of the Debtors) (the "Eligible Employees"). The Eligible Employees are insiders of the Debtors within the meaning of section 101(31)(B) of the

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: iBAHN Corporation (9189), iBAHN General Holdings Corp. (5253), and iBAHN Leasing LLC (2004). The location of the Debtors' headquarters and the service address for each of the Debtors is 2755 E. Cottonwood Parkway, Suite 400 Salt Lake City, Utah 84121.

Bankruptcy Code. The maximum aggregate amount of incentive payments that could be payable under the Incentive Plan is $140,000.

In order to incentivize the Eligible Employees to work hard to obtain the maximum value possible for the Assets in the Sale and/or to achieve confirmation of a Plan, the Debtors seek authority to implement a performance-based incentive plan pursuant to which the Eligible Employees will receive an incentive payment upon the occurrence of the earlier of (a) closing of a Sale in which the Assets are sold for an amount (in cash, credit bid and assumed liabilities) in excess of $11,500,000.00 or (b) the effective date of a Plan. As set forth in the Incentive Plan, and Exhibit A thereto, the amount of the Eligible Employee's incentive payment is based upon the either the actual purchase price received by the Debtors or the occurrence of the Effective Date of the Plan.

The best efforts of the Eligible Employees are absolutely critical to the success of the Sale process in generating higher and better offers or to the Plan process. The Debtors believe that the implementation of the Incentive Plan will motivate the Eligible Employees to work as hard as they can, and thereby maximize the potential that creditors obtain the greatest value possible for the Assets or confirmation of the Plan. Under the terms of the Incentive Plan, the Eligible Employees will only be paid an incentive payment if they meet the objective, numerical benchmark set forth in the Incentive Plan, and thereby create additional value for the creditors. In support of this Motion, the Debtor respectfully represents as follows:

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Debtor's chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a), 363(b) and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3. On September 6, 2013 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

5. The Debtors and their non-debtor affiliates (collectively referred to herein as the "Company") are global technology service providers for the hospitality industry providing integrated digital services, including wired and wireless high-speed internet access, digital television, video-on-demand, and digital audio to guest rooms, conference facilities and other common areas at over 2,200 hotel properties in North America, South America, Europe, Africa, Australia and Asia. The Company also provides wired and wireless high-speed internet access directly to corporations for various events and conferences. The Company's end-to-end IP architecture delivers network monitoring, management and support capabilities to the hotel properties it services. The Company is headquartered in Salt Lake City, Utah, and maintains

regional offices in Denver, Colorado, London, U.K., Hong Kong, Stirling, Scotland, Cairo, Egypt, and Sydney, Australia, with additional satellite offices throughout the world.

      6.      The Company conducts business in three operational divisions: (1) the Americas (United States, Canada, Mexico and Peru), (2) EMEA (Europe, the Middle East and Africa) and (3) Asia. The Debtors operate in the Americas division and the non-debtor subsidiaries operate in the EMEA and Asia divisions. Traditionally, the Americas and Europe have been the most significant revenue generating sectors of the Company's business, but the Company views Asia and the Middle East as growth areas.

      7.      Worldwide, the Company derives most of its revenue through key contracts with large international hotel chains by providing WIFI service to guestrooms. The Debtors' two largest contracts are with Marriott International and Hilton Worldwide. The Company also provides wired and wireless high-speed internet access directly to corporations for various events and conferences. The Company's end-to-end IP architecture delivers network monitoring, management and support capabilities to the hotel properties it services. In addition, the Company provides Internet Protocol television ("IPTV") to hotels, a system through which live television, time-shifted television and video on demand are provided to hotel guest rooms.

      8.      Fiscal year revenues for the Company for the past several are as follows:

| 2010 | 2011 | 2012 |
| --- | --- | --- |
| $ 98.3 million | $ 97.3 million | $ 82 million |

9. Additional factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the Declaration of Ryan Jonson in Support of First Day Motions (the "Jonson Declaration") filed on the Petition Date and incorporated herein by reference.[2]

10. Prior to the commencement of these Cases, the Debtors attempted to achieve an additional investment, business combination or asset sale. For more than a year, prepetition, the Debtors worked to achieve such a transaction. While a number of significant prospects surfaced prepetition, no transaction has been consummated as of that time.

11. In June of 2013, the Company reduced staff by laying off approximately 40% of staff in the Americas business operations.

12. Between May of 2013 and the Petition Date, the Debtors ended their relationships with their Chief Executive Officer and the head of the Americas division.

13. With resources significantly depleted due to the significant litigation and revenue down due to the changes implemented by the Company's key customer (as described in more detail in the Jonson Declaration) the Company filed this Chapter 11 Case to preserve value for its creditors and parties in interest and to provide a platform for iBAHN to restructure its business while continuing to seek an additional investment, sale or possible business combination.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Jonson Declaration.

## **The Proposed Incentive Plan**[3]

14. <u>Eligible Employees</u>. As noted above, the Eligible Employees consist of three officer level employees – Helvey, Jonson and Brannelly.

15. Edward Helvey recently re-joined iBHAN as the Company's Chief Executive Officer. Mr. Helvey formerly served as iBAHN's Vice President of Online Services from 1999-2001. Mr. Helvey has previously operated technology firms and served in senior management positions for over twenty-five years. This experience includes leading distressed companies though to successful recovery. Immediately upon joining the Debtors, Mr. Helvey assumed a leadership role in obtaining a transaction. He has and continues to work to identify prospects for additional investment, business combination or asset sale. Mr. Helvey has personally met with many prospects and developed leads which will hopefully mature into a suitable transaction for the benefit of the Debtors and their estates. Mr.Helvey serves as CEO and also assumed many of the responsibilities formerly performed by the head of the Company's Americans division.

16. Ryan Jonson is the Chief Financial Officer for each of the above-captioned debtors (the "<u>Debtors</u>"). Mr. Jonson first joined the Debtors in 2002, starting as the Company's (as defined below) Controller. In March of 2012 Mr. Jonson became the Company's CFO. In such capacity, his current duties include oversight of all accounting and financial

---

[3] This summary of material terms of the Incentive Plan has been included for the convenience of the parties receiving this Motion. It in no way alters, changes or amends the actual terms set forth in the Incentive Plan itself. In the event that there are any inconsistencies between this summary and the Incentive Plan, the language set forth in the Incentive Plan controls.

aspects of iBAHN's operations. Prior to his employment with the Debtors, Mr. Jonson held a range of financial and operational leadership positions in the technology field.

17. Specifically related to the Debtors current efforts, Mr., Jonson is familiar with many of the strategic and financial players in the market. Prepetition and postpetition, Mr. Jonson has been involved in identifying prospects, developing relationships and supervising due diligence efforts. Moving forward, Mr. Jonson's skills and institutional knowledge will be a key factor in realizing a suitable transaction or Plan.

18. Jack Brannelly re-joined the Company as its general counsel shortly before the Petition Date  Mr. Brannelly served as the Company's general counsel from 1999-2002. Mr. Brannelly is responsible for supervising the legal aspects of the Debtors' Chapter 11 Cases and operations generally. Since joining the Debtors, Mr. Brannelly has led the effort in terms of the legal aspects of the Debtors cases. He is expected to continue to advise the Debtors regarding legal issues and work with the Debtors' professionals to bring any prospective transaction or Plan into reality.

19. <u>Performance Goal</u>. In order for the Eligible Employees to receive an incentive payment under the Incentive Plan, one of two things must occur: (a) the Debtors must close on a Sale of the Assets for a purchase price (including cash, credit bid and assumed liabilities) in excess of $11,500,000 or (b) the Debtors must reach the Effective Date of a Plan (the "<u>Performance Goal</u>").

20. <u>Incentive Payments</u>. The incentive payment will be paid to the Eligible Employees upon the satisfaction of a Performance Goal.

21. <u>Additional Terms</u>. In addition to the foregoing terms and conditions, the Incentive Plan provides, among other things, that: (i) the Eligible Employees must be employed by the Debtors at the time the Performance Goal is achieved; (ii) except as otherwise set forth in the Incentive Plan, payments thereunder will be in lieu of any other postpetition performance bonus or retention compensation otherwise payable to the Eligible Employees; and (iii) the Eligible Employees shall release the Debtors and related parties in accordance with the terms of the release set forth in the Incentive Plan.

22. JP Morgan Chase, the Debtors' DIP Lender has consented to the terms of the Incentive Plan and payment of the incentive payments if approved by the Court and the requirements of the Incentive Plan are met.

## Relief Requested

23. By this Motion, the Debtors request that the Court enter an order, pursuant to sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, approving the proposed Incentive Plan and authorizing the Debtor to make the payments contemplated thereunder, <u>if</u> the Eligible Employees satisfy the Performance Goal.

## Basis for the Relief Requested

A. **Implementation of the Incentive Plan is a Valid Exercise of the Debtors' Business Judgment Pursuant to Section 363(b) of the Bankruptcy Code**

24. The Court may authorize the Debtors to implement the Incentive Plan under section 363(b)(1) of the Bankruptcy Code. Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use, sale, or lease of property of the estate,

other than in the ordinary course of business, is authorized when a "sound business purpose" justifies such action. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under §363(b) when there us a legitimate business justification); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

25. Historically, courts have approved employee compensation programs that are outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code. See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program; stating that "in determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); In re Global Home Products, LLC, 2007 Bankr. LEXIS 758, at *15 (Bankr. D. Del. March 6, 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); In re Nobex Corp., 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtor's business judgment."); In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz 1994) (it is the proper use of a debtors' business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); In re Interco Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo 1991) ("debtors' business judgment" was controlling in the approval of a

"performance/retention program"). See also, In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. March 28, 2006); In re Pliant Corp., Case No. 06-10001 (Bankr. D. Del. March 14, 2004).

26. The Debtors submit that the implementation of the Incentive Plan is a proper exercise of its business judgment. As noted above, in order to maximize creditor outcomes in this case, the Debtors need to achieve one of two outcomes in this case. The first Performance Goal is closing on an Asset Sale for an amount that is in excess of $11,500,000. To accomplish this Performance Goal, the Debtors must: (i) successfully market the Assets; (ii) generate interest upon the part of other potential purchasers; (iii) receive qualified bids; (iv) engage in an auction pursuant to which bidding in excess of the $11,500,000 occurs; and (v) close on the Sale for an amount in excess of the $11,500,000. The second and alternate Performance Goal is to achieve confirmation and occurrence of the Effective Date of the Plan. In order to achieve this goal, Debtors, largely through the efforts of the Eligible Employees, must propose a Plan which provides sufficient return to creditors to garner sufficient votes to achieve approval of the Plan and, subsequent to approval, continue their efforts to implement such Plan. The work and efforts of the Eligible Employees are absolutely critical to the success of either Performance Goal.

27. To help ensure that the above-noted tasks are in fact completed, the Debtors devised the Incentive Plan. The Debtors believe that the Incentive Plan provides a mechanism which will motivate the Eligible Employees to complete the requisite work necessary for selling the Assets for an amount in excess of the Purchase Price or achieving confirmation of a Plan. Pursuant to the terms of the Incentive Plan, the Eligible Employees will only be paid an

incentive payment if they meet the objective Performance Goal set forth in the Incentive Plan, and thereby create additional value for the creditors.

28. The Debtors submit that implementation of the Incentive Plan is an appropriate exercise of its business judgment under section 363(b)(1) of the Bankruptcy Code, and should therefore be approved by the Court.

**B.    The Incentive Plan Complies With Section 503(c) of the Bankruptcy Code**

29. Section 503(c) of the Bankruptcy Code is applicable to all bankruptcy cases filed after October, 2005. It provides criteria for courts to use in approving certain types of payments to insiders and "other transfers of obligations that are outside of the ordinary course of business." Section 503(c) contains: (1) a general prohibition of retention plans for insiders of a debtor; (2) limitations on severance payments to insiders of a debtor; and (3) standards governing other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the Petition. 11 U.S.C. § 503(c). For the reasons set forth herein, neither section 503(c)(1) nor 503(c)(2) are applicable to the Incentive Plan. Moreover, as set forth below, the Incentive Plan complies with section 503(c)(3) of the Bankruptcy Code and should therefore be approved.

**Sections 503(c)(1) and (2) are Not Applicable to the Incentive Plan**

30. Pursuant to the statute's plain language, section 503(c)(1) of the Bankruptcy Code pertains solely to retention plans, and section 503(c)(2) only addresses the requirements for severance plans. Neither section applies to performance-based incentive plans. See, e.g., Global Home Products, 2007 Bankr. LEXIS 758, at *14 ("If [the proposed plans] are

plans to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); In re Nobex Corp., Case No. 05-20050, 01/12/06 Hearing Tr. at 67 (Bankr. D. Del. 2006) (MFW); In re Calpine Corp., Case No. 05-60200, 04/26/2006 Hearing Tr. at 87 (Bankr. S.D.N.Y. 2006(BRL). Indeed, Judge Lifland has held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among other things, outside of the ordinary course, unless such payments are shown to be justified under the facts and circumstances of the chapter 11 case. As one treatise points out, the test appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(A).

In re Dana Corporation, 358 B.R. 567, 576 – 77 (Bankr. S.D.N.Y. 2006).

31.  The Incentive Plan is neither a retention plan nor a severance plan. Instead, the Incentive Plan is a performance-based plan that provides for targeted payments to certain employees if they meet the objective performance criteria set forth in the Incentive Plan. The purpose of the Incentive Plan is to motivate the Eligible Employees to work very hard in order to obtain the incentive payments. Neither the performance goals nor the incentive payments provided under the Incentive Plan have an impermissible retention or severance component. Therefore, sections 503(c)(1) and (c)(2) are not applicable to the Incentive Plan.

### The Incentive Plan Complies With Section 503(c)(3)

32.  The Incentive Plan, and the payments contemplated thereunder, comply with section 503(c)(3) of the Bankruptcy Code. The statute states that:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid—
>
> (3) other transfers or obligations that are outside of the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of,

>officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3). Since courts have begun to analyze various payments under section 503(c)(3), they have been unanimous in holding that they must use the "business judgment" standard as the proper standard for determining whether incentive programs and payments thereunder are justified. See e.g., Global Home Products, 2007 Bankr. LEXIS 758, at *14; In re Werner Holding Co., Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, August 22, 2006, and December 20, 2006); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. March 28, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. March 14, 2006).

>33.    Indeed, Judge Walrath, in the Nobex case, stated that:
>
>>[Section] (c)(3) was meant to provide a standard, albeit not as clear, for any other transfers or obligations outside of the ordinary course of business ... I read (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or obligations made outside of the ordinary course of business are those that are justified by the facts and circumstances of the case... I find it quite frankly nothing more than a reiteration of the standard under 363... under which courts had previously authorized transfers outside of the ordinary course of business and that [are], based on the business judgment of the debtor...

Transcript of January 12, 2006, Hearing at 86-87, In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del.) (an order approving the management incentive plan was entered January 20, 2006). More recently, in Dana, Judge Lifland agreed with Judge Walrath, stating that management incentive programs should be evaluated under the business judgment standard, which requires a debtor to satisfy the Court's inquiry into factors such as:

(1) Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e. will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or in the case of a performance incentive, <u>is the plan calculated to achieve the desired performance</u> (emphasis added)?

(2) Is the cost of the plan reasonable in the context of the debtors' assets, liabilities and earning potential?

(3) Is the scope of the plan fair and reasonable; does it apply to employees; does it discriminate unfairly?

(4) Is the plan or proposal consistent with industry standards?

(5) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

(6) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

<u>Dana Corp.</u>, 358 B.R. at 576 - 577 (citations omitted). Moreover, Judge Lifland noted that courts generally take a "holistic" view of and measure of compensation packages. <u>Id</u>. at 571.

34. As noted above, the Debtors have a sound business purpose for establishing the Incentive Plan, and the Incentive Plan satisfies the factors articulated by Judge Lifland in <u>Dana</u>. First, the Incentive Plan is a performance-based plan that has been calibrated by the Debtors to motivate the Eligible Employees to "achieve the desired performance" under Performance Goal of the Incentive Plan.

35. Second, the Debtors believe that the costs of the Incentive Plan are reasonable in the context of the Debtors' chapter 11 case, and in light of the amount of work that must be completed by the Eligible Employees, in a compressed amount of time, to obtain their incentive payments. Moreover, the amount of the incentive payments are tied to the additional

value that will be created by the Eligible Employees if the Assets are sold for an amount in excess of the $11,500,000 or if a Plan is confirmed.

36. Third, the Incentive Plan is "fair and reasonable" in its scope and does not "discriminate unfairly," because the Debtors designed the Incentive Plan to only include those employees whose services, in the Debtors' opinion, are truly necessary to achieving the Performance Goal.

37. The Debtors submit that the fourth factor noted by Judge Lifland – i.e. is the plan or proposal consistent with industry standards – is not applicable to the facts and circumstances of the Debtors' case. To the best of the Debtors' knowledge, there is no "industry standard" for compensation programs for the employees of failed companies in the Debtors' business.

38. Fifth, the Debtor engaged in appropriate due diligence in formulating the Incentive Plan under the facts and circumstances of their chapter 11 case. Moreover, as set forth above, the Debtors' Board of Directors considered, modified and approved the Incentive Plan presented herein.

39. Finally, the Debtors note that due to the exigencies under which it was operating while preparing to file the chapter 11 case, it was unable to obtain independent counsel in formulating the Incentive Plan. This fact, however, does not preclude approval of the Incentive Plan. As noted above, the application of the Dana "factors" is a holistic endeavor. Id. at 571. Moreover, in In re American Home Mortgage Holdings, Judge Sontchi articulated the holistic application of the Dana factors while considering the interim approval of a retention plan. In approving that plan, in part on an interim basis, Judge Sontchi stated that:

> I think the Debtors have satisfied certainly the most important criteria in connection with the non-insiders. There's a reasonable relationship between the plan and the results to be obtained, the cost of the plan is reasonable, the context of the debtors' assets, liabilities, and the scope of the plan is fair and reasonable... Some of the other criteria may not have been met such as what were the due diligence efforts, you know, did you shop around and see what other plans were out there? <u>Did the debtor receive independent counsel from some sort of expert? Frankly, I don't consider those overtly significant, and certainly understandable that they weren't done in the context of what was an extremely quick meltdown of the debtors' business.</u> (emphasis added)

Transcript of August 7, 2007, Hearing at 110, In re American Home Mortgage Holdings, et al., Case No. 07-11047 (CSS) (Bankr. D. Del.). The Debtors submit that its inability to obtain independent counsel in formulating the Incentive Plan is a consequence of the exigent circumstances it faced prior to the Petition Date, and, as with American Home Mortgage Holdings, is not overtly significant.

        40. Based upon the foregoing, the Debtors submit that they have established a "sound business purpose" for the formulation and implementation of the Incentive Plan, and therefore satisfies the requirements of section 363(b) and 503(c)(3) of the Bankruptcy Code. As set forth in detail above, the Incentive Plan is a "true" incentive plan that has been designed to motivate the Eligible Employees to produce results. The Incentive Plan is not "pay to stay," as none of the Eligible Employees will receive any payments, or partial payments, under the Incentive Plan if they fail to meet the Performance Goal. Moreover, in consideration of the benefits offered under the Incentive Plan, the Eligible Employees have waived any claims and causes of action (as provided in the Incentive Plan) against the Debtors. The Debtors believe

that this waiver of claims further ensures that the Eligible Employees have the requisite "skin in the game" to be truly motivated to achieve the Performance Goal.

41. Accordingly, the Debtors submit that the Incentive Plan should be approved and, if the Eligible Employees meet the Performance Goal provided thereunder, they should be paid their respective incentive payments by the Debtors.

## Notice

42. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Debtors' prepetition and postpetition lender; (c) the thirty five largest unsecured creditors of the Debtors; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

43. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto, granting the Motion, and grant such other and further relief as is just and proper.

Dated: November 25, 2013

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar 167624)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Telephone:  302-652-4100
Facsimile:   302-652-4400
E-mail: ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         joneill@pszjlaw.com
         tcairns@pszjlaw.com

Counsel to the Debtors and Debtors in Possession